# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHAWN WILLIAMS** | : | **CIVIL ACTION** |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **NO. 23-CV-2982** |
| | : | |
| **JAIME SORBER, *et al.*,** | : | |
| *Defendants* | : | |

## M E M O R A N D U M

*NITZA I. QUIÑONES ALEJANDRO, J.*                                         MAY 10, 2024

Before the Court is a *motion to dismiss the amended complaint*, (ECF No. 25), previously filed by Plaintiff Shawn Williams, a prisoner currently incarcerated at SCI Phoenix, against Jaime Sorber, the former Superintendent of SCI Phoenix, and two former Secretaries of Corrections, John E. Wetzel and George M. Little, (collectively, "Defendants").[1]  In his Amended Complaint, Williams raises various constitutional claims pursuant to 42 U.S.C. § 1983, premised on a transfer to "quarantine housing" during the Covid-19 pandemic due to his unvaccinated status, and a claim for denial of access to the courts.  (ECF No. 23 ("Am. Compl.").)  For the reasons set forth, the motion to dismiss the Amended Complaint is granted.

---

[1]        Williams filed his Amended Complaint in response to Defendants' Motion to Dismiss his original Complaint.  "[A]n amended pleading supersedes the original pleading and renders the original pleading a nullity." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019).  In other words, "the most recently filed amended complaint becomes the operative pleading." *Id.*  This means only the allegations and claims presented in the Amended Complaint are relevant to whether Williams has alleged sufficient facts to state a claim.  In any event, the Amended Complaint is similar in substance to Williams' initial Complaint.

## I.      FACTUAL ALLEGATIONS

Williams' claims predominately stem from his confinement on the "quarantine housing (segregated confinement) unit" at SCI Phoenix for an eight-month period commencing August 1, 2021 through April 1, 2022.  (Am. Compl. ¶ 1.)  The circumstances giving rise to his claims occurred against the backdrop of the Covid-19 pandemic, which caused a lock down at SCI Phoenix from approximately March 30, 2020, through April 1, 2022.  (*Id.* ¶ 9.)  At the time, SCI Phoenix had approximately 3,000 inmates on sixteen housing units.  (*Id.* ¶¶ 18-19.)  During the pandemic, "Defendants gave every prisoner two mask[s] and instructions on what to do to avoid catching COVID-19."  (*Id.* ¶ 22.)  According to Williams, all prisoners and staff were required to wear masks at all times regardless of vaccination status.  (*Id.* ¶ 14; *see also id.* ¶ 23.)

The Johnson & Johnson vaccine was made available to prisoners at SCI Phoenix as of June or July of 2021.  (*Id.* ¶ 10.)  Sorber encouraged prisoners to get vaccinated and informed them that the lock down would only be lifted if the prison achieved "heard immunity."[2]  (*Id.* ¶¶ 10-11.)  Williams asserts that he is not "anti vaccine" but that he "declined to be vaccinated due to his religious beliefs."  (*Id.* ¶ 13.)  Specifically, Williams is Muslim, and a tenet of his religion requires him to live a natural life and to use "natural medicines that do not cause harm/side effects to the body."  (*Id.* ¶ 30.)

On July 29, 2021, Sorber informed prisoners at SCI Phoenix that three vaccinated inmates had tested positive for Covid-19.  (*Id.* ¶ 17.)  As a result, at the direction of Defendant Sorber, prison officials informed Williams that he would have to be tested for Covid-19 and quarantined to his cell, and that if he refused, he would be sent to the restricted housing unit or placed in "an extreme enhanced quarantine isolation."  (*Id.* ¶ 24.)  Williams alleges that only unvaccinated

---

[2]      Williams alleges that the prison achieved herd immunity because over 80% of prisoners received the vaccine; it is unclear when this is allegedly happened.  (Am. Compl. ¶ 12.)

inmates were treated this way.  (*Id.* ¶ 25.)  He contends that he did not want to be tested but agreed under the circumstances to avoid a housing transfer.  (*Id.* ¶¶ 24, 26.)

Williams' test result showed that he was negative for the virus.  (*Id.* ¶¶ 1, 27.)  He was nevertheless transferred on August 1, 2021, from his housing on D-A Unit to the R-Unit, which "was a general population housing unit . . . that Defendant Sorber converted into a quarantine housing unit for unvaccinated prisoners."  (*Id.* ¶¶ 20, 27, 31.)  Williams alleges that his transfer was part of an effort that occurred between August 1 through August 5 to remove all unvaccinated prisoners from general population by transferring them to a "segregated confinement unit indefinitely."  (*Id.* ¶ 30.)  During the course of his transfer, non-defendant Deputy Sipple told Williams that "a large number of the staff at Phoenix were unvaccinated including herself."  (*Id.* ¶ 21.)

According to Williams, after a few days on R-Unit, many prisoners "began begging to be vaccinated so they [could] return to general population" where the conditions were more favorable.  (*Id.* ¶ 32.)  Williams alleges that in general population, there was a rotation system pursuant to which some prisoners ate their meals in their cells while others ate in the dayroom, but that inmates on the quarantine unit were limited to eating in their cells.  (*Id.* ¶ 16.)  He further alleges that during the first month or two on the quarantine unit, he was provided only fifteen minutes a day to use the phone, shower and/or kiosk.  (*Id.* ¶ 28.)  Thereafter, when Williams' "cohort went to 4 cells out at a time," he was provided with thirty to forty-five minutes of out-of-cell time per day, which he alleges was less than prisoners housed in the RHU received.  (*Id.*)  Williams further alleges that, while he was on the quarantine unit, he was "not allowed access to the law library/regular library, religious services, vocational programs, legal visits, contact visits, or anything else off the housing

unit."[3]  (*Id.* ¶ 29; *see also id.* ¶ 49 (alleging that Williams was "only allowed to have four zoom visits" and was not "permitted physical contact with any of his visitors under any circumstances").)  Williams alleges that there was no library on the R-unit and that his "access to books and reading materials [was] strictly limited," especially because prisoners were not permitted to pass reading materials to each other.  (*Id.* ¶¶ 51-52.)

All of these conditions, Williams contends, were "extremely different" than the conditions in general population.  (*Id.* ¶ 53.)  Specifically, he alleges that:

> (a) prisoners in general population are permitted outside access everyday and yard from 8:15-1045am, 1:15pm-3:15pm, 6:15pm-8:15pm and access to the large main yard every other day where they buy ice-cream, beanpies, etc; (b) prisoner[s] in general population have access to a gym and many hours of library time; (c) prisoners in general population have access to their dayroom everyday from 1:15pm-3:45pm, and 6:15pm to 8:45pm, if there is no morning yard the prisoners get a dayroom from 8:15am-10:45am; (d) prisoners in general population can eat in the units dayroom with othe[r]s if they choose to; (e) prisoners in general population have access to telephones from 815am-1045am and 1:15pm-3:45pm and 6:15pm-8:45pm; (f) prisoners in general population [are] permitted physical contact with visitors; (g) prisoners in general population are permitted to attend vocational classes, programs, and religious services.

(*Id.*)

On November 1, 2021, Williams was given a cellmate who allegedly "tested positive for COVID-19 a few days prior to being transferred to Phoenix from SCI- Camphill" and was not retested before being housed with Williams.  (*Id.* ¶ 34.)  Williams alleges that Defendants "knowingly endangered [his] life" by housing them together.  (*Id.*)  Three days later, Williams requested a transfer back to general population "due to his religious beliefs" and alleged violations of "health and safety protocols" and was told to submit a DC-ADM 819 Religious Accommodation Form.  (*Id.* ¶ 35.)  Williams did so, but never received a response.  (*Id.*)  He notes that, at times,

---

[3]  Williams also describes an incident on August 18, 2021, during which inmates on R-Unit were forced out of their cells and made to stand in the middle of the dayroom wearing only a T-shirt, underwear, and shower shoes while dogs sniffed them and guards tossed their cells.  (*Id.* ¶ 33.)

fully vaccinated inmates were housed on the unvaccinated segregated unit; he claims this caused Covid 19 breakouts and "endangered all unvaccinated prisoners."  (*Id.* ¶¶ 36, 57, 59.)

On December 3, 2021, a prisoner on the unvaccinated unit tested positive for Covid-19 so the unit was put on lockdown.  (*Id.* ¶¶ 37-38.)  At Sorber's direction, a nurse came to the unit twice a day to check the temperature, vital signs, and oxygen levels of the inmates on the unit and to provide Covid-19 tests.  (*Id.* ¶ 38.)  Williams tested negative for the virus.  (*Id.* ¶ 39.)  Williams alleges that the officers who came in contact with the infected inmate were not quarantined and, rather, remained on the unit and moved freely about the prison.  (*Id.* ¶ 39.)  As a result of the outbreak, the prisoners on the unit, including Williams, were only permitted out of their cells for fifteen minutes twice a day, which did not include any time in the yard or outside the unit.  (*Id.* ¶ 40.)

On December 13, 2021, it was reported that prisoners on section B of the unvaccinated unit tested positive for Covid-19; the Amended Complaint implies that this was due to contact with "staff members."  (*Id.* ¶ 41.)  Approximately four days later, Williams learned from Defendant Little "that the J&J vaccine he refused to take . . . was immediately being discontinued and administered by the PA DOC to its inmates because it was causing medical complications such as blood clots, fatigue, muscle pain, death etc."  (*Id.*)  Williams' unit was placed on lockdown from December 3, 2021 through December 17, 2021, and again from January 19, 2022 through February 2, 2022, due to Covid-19 outbreaks, which Williams describes as "indefinite lockdown."  (*Id.* ¶ 48.)  During these lockdown periods, Williams "had no access to cleaning supplies, clean (fresh) air, law library etc. and [he] was also denied access to see the psychologist when he requested." (*Id.*)  He adds that he had suicidal thoughts and was "living in filth" during these periods.  (*Id.*)

Williams alleges that he never tested positive for Covid-19 and never had any symptoms, but that he was nevertheless confined on the quarantine unit because of his unvaccinated status. (*Id.* ¶ 43.)  He alleges that he was quarantined "to punish him and make him suffer for exercising his first amendment right to practice his religious beliefs and refuse medical treatment."  (*Id.* ¶ 44.) Williams further contends that the restrictive conditions and "prolonged quarantine segregated confinement . . . took a toll on his mental and physical well being."  (*Id.* ¶¶ 45, 47.)

Williams claims that by housing him on R-unit due to his unvaccinated status for the eight-month period from August 1, 2021 through April 1, 2022, even though he never tested positive for Covid, Defendants violated his Eight Amendment rights, Due Process rights, and Equal Protection rights, and retaliated against him for exercising his religious beliefs.  (*Id.* ¶¶ 63-88.)  Williams also claims that he was denied access to the courts because his "efforts to pursue a legal claim was hindered . . . when he was not allowed access to an adequate law library," which prevented him from "prepar[ing] his Nunc Pro Tunc Petition to the PA Supreme Court on or about October 19, 2021."  (*Id.* ¶¶ 91-92.)  The Amended Complaint reflects, however, that Williams was in fact able to file a petition, but that it was denied on January 27, 2022; he also claims he attempted to file for reconsideration but was unable to properly do so.  (*Id.* ¶ 92.)  Williams seeks damages for the alleged violation of his constitutional rights.  (*Id.*)

## II.    THE PARTIES' POSITIONS

Defendants moved to dismiss the Amended Complaint for failure to state a claim.  (ECF No. 25.)  Defendants argue that the Amended Complaint should be dismissed pursuant to the "first filed" rule because another inmate at SCI Phoenix brought "almost identical" claims in this Court and his case is currently pending before another Judge.  (ECF No. 25-2 at 4-5 (citing *Walker v. Sorber*, No. 21-3477 (E.D. Pa.)).)  Defendant also argue that Williams' claims should be dismissed

on their merits because (a) Williams failed to allege that he was deprived of the minimal civilized measure of life's necessities in violation of the Eighth Amendment, (*id.* at 6); (b) even assuming his quarantine constituted an atypical and significant hardship he knew of his reason for placement on the quarantine unit and had an opportunity to be heard by way of the grievance system, (*id.* at 6-7); (c) Williams failed to allege outrageous conduct to support a substantive due process claim, (*id.* at 8); (d) Williams cannot state an equal protection claim since there was "a rational basis to separate the vaccinated from the unvaccinated inmates," (*id.* at 9); and (e) and housing unvaccinated inmates separately does not amount to an adverse action sufficient to support a retaliation claim but, regardless, the housing assignment "was not designed to punish but protect", (*id.* at 10-11). Defendants also moved to dismiss Williams' claim that he was denied access to the courts because he failed to allege the loss of a nonfrivolous claim. (*Id.* at 11-13.) In that regard, they note that the public docket for Williams' criminal case reflects that he delayed filing a petition for allowance of appeal before he was placed in quarantine. (*Id.* at 12-13.)

In response, Williams notes that his case is different from Walker's in certain respects, so the first-filed rule does not justify dismissal. (ECF No. 27 at 2.) Further, Williams argues that the conditions he described in his Amended Complaint related to his housing on the quarantine unit are sufficient to support plausible constitutional claims for relief. (*Id.* at 2-3; *see also* at 1 (alleging that he "has specified [a] clear narrative of events that define not only unconstitutional acts of the defendants, but provide[] the necessary facts to show that [he] must be provided relief.").) He also contends that he was, in fact, denied access to the courts as to his filing in the Pennsylvania Supreme Court because "prison authorities did not assist him in preparation and filing [of] meaningful legal papers" and because he only learned in May or June of 2021 that his attorney had failed to file the petition on his behalf. (*Id.* at 3-4.)

7

### III.    STANDARDS OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) "tests the sufficiency of the allegations contained in the complaint."  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555.)  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).  To determine whether a complaint filed by a *pro se* litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim."  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally). Additionally, since Williams is proceeding *in forma pauperis*, the Court may independently screen

his Amended Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

## IV.   DISCUSSION

### A.   First-Filed Rule

The "first-filed" rule "gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *E.E.O.C. v. Univ. of Penna.*, 850 F.2d 969, 971-72 (3d Cir. 1988), *aff'd,* 493 U.S. 182 (1990) (quoting *Triangle Conduit & Cable Co. v. Nat'l Elec. Prods. Corp.*, 125 F.2d 1008, 1009 (3d Cir. 1942)); *Honeywell Int'l Inc. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 502 F. App'x 201, 205 (3d Cir. 2012) ("[T]he first-filed rule ordinarily counsels deference to the suit that was filed first, when two lawsuits involving the same issues and parties are pending in separate federal district courts."). This rule is grounded in principles of equity and comity, allowing judges to fashion flexible responses to prohibit duplicative subsequent litigation that is motivated by an intent to game the system. *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 216 (3d Cir. 2016) (*en banc*). However, a district court's authority under the first-filed rule "is not a mandate directing wooden application of the rule" and "courts have always had discretion to retain jurisdiction given appropriate circumstances." *Univ. of Pennsylvania*, 850 F.2d at 972.

Importantly, "a court exercising its discretion under the first-filed rule should be careful not to cause unanticipated prejudice to the litigants before it." *Chavez*, 836 F.3d at 219.

Accordingly, "in the vast majority of cases, a court exercising its discretion under the first-filed rule should stay or transfer a second-filed suit." *Id.* at 220.  Indeed, "[e]ven a dismissal *without prejudice* may create unanticipated problems" and "[a] dismissal *with prejudice* will almost always be an abuse of discretion." *Id.* at 220-21.

Defendants argue that Williams' case should be dismissed pursuant to the first-filed rule because another inmate filed similar claims based on the same conditions of confinement in which he was also held, and that inmate's lawsuit is currently pending before another Judge of this Court at the summary judgment stage.  (ECF No. 25-2 at 5(citing *Walker*, Civ. A. No. 21-3477)).  The United States Court of Appeals for the Third Circuit has rejected application of the first-filed rule where previously filed cases "were filed by plaintiffs who have no involvement whatsoever with the [later-filed] case" and neither pursued "identical claims, nor compulsory counterclaims." *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 333 n.6 (3d Cir. 2007).  Although some district courts concluded that this language from the Third Circuit was *dicta* such that parties need not be the same in both cases for the first-filed rule to apply, others have disagreed, concluding that the same parties and issues are required for its application. *Compare Synthes, Inc. v. Knapp*, 978 F. Supp. 2d 450, 456 (E.D. Pa. 2013) ("Other district court decisions post-*Grider* have held that the cases need not necessarily be identical for the first-filed rule to apply.") *with Coyoy v. United States*, 526 F. Supp. 3d 30, 44 (D.N.J. 2021) (declining to apply fir-filed rule where "[t]hese cases do not involve the same parties or the same issues."); *see also  L. Sch. Admission Council, Inc. v. Tatro*, 153 F. Supp. 3d 714, 723 (E.D. Pa. 2015) ("There is disagreement among courts within this Circuit as to how 'related' cases must be for the first-filed rule to apply.").  The Third Circuit, however, has generally hewed to the principle that the litigation must be duplicative. *See Chavez*, 836 F.3d 205, 210 (describing the first-filed rule as "a comity-based doctrine stating that,

10

when duplicative lawsuits are filed successively in two different federal courts, the court where the action was filed first has priority"); *Complaint of Bankers Tr. Co. v. Chatterjee*, 636 F.2d 37, 40 (3d Cir. 1980) ("It is important, however, that only truly duplicative proceedings be avoided.").

Defendants make no attempt to address this issue, nor do they cite any cases applying the first-filed rule in a context analogous to the circumstances under which they have asked the Court to apply it here. Regardless, whatever space might exist between how "related" two cases must be for the first-filed rule to apply, it is difficult to discern how it would apply here. Defendants are asking the Court to dismiss a prisoner's later-filed case simply because another prisoner at the same facility filed a prior lawsuit challenging the same and/or similar conditions of confinement in which he was also held. Even if the *Walker* case provides insight into how another Judge resolved similar legal issues, Williams' rights are simply not at issue in that case, a judgement for Walker cannot grant Williams the relief he seeks, and a judgment for the defendants in the "first-filed" case is not binding upon Williams. *See In re New Century TRS Holdings, Inc.*, No. 21-3277, 2023 WL 155449, at *3 (3d Cir. Jan. 11, 2023) ("The Lynches' interpretation of the [first-filed] rule, which seemingly would look to when an issue or argument is raised instead of when an *action* is filed for purposes of choosing the court that has adjudicatory priority, finds no support in our precedent."). Indeed, if the Court were to dismiss Williams' case, he would be prejudiced from ever reasserting his claims because they would now be time-barred. *See Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) ("The statute of limitations for a § 1983 claim arising in Pennsylvania is two years."). In sum, the Court concludes that the first-filed rule is not applicable here. But even if the rule were somehow applicable, it would be unjust to apply it in this case because there is no suggestion of forum shopping or bad faith use of the legal system, and dismissal in such a circumstance would certainly amount to an abuse of discretion because it would preclude Williams

from ever pursuing his claims.  *See Chavez*, 836 F.3d at 220 ("[A] district court should generally avoid terminating a claim under the first-filed rule that has not been, and may not be, heard by another court."); *see also Samsung Elecs. Co. v. Imperium Holdings (Cayman), Ltd.*, 764 F. App'x 199, 200 (3d Cir. 2019) (vacating without prejudice dismissal based on first-filed rule, which effectively constituted a with prejudice dismissal, on the basis that it was an abuse of discretion). Because this Court concludes that the first- filed rule is not applicable here, Accordingly, this matter will not be dismissed on the first-filed rule.

### B.  Merits of Williams' § 1983 Claims

Defendants also argue that Williams' claims should be dismissed on their merits.  As noted, Williams brings his claims pursuant to § 1983.  To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and/or laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).  "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct.") (quoting *Iqbal*, 556 U.S. at 677).  For the reasons set forth, the Court concludes that Plaintiff's Amended Complaint does not state a claim for relief against Defendants.

### 1.  Eighth Amendment Claim

Defendants argue that Williams has failed to state a claim based on the conditions to which he alleges he was subjected on R-Unit.  "To determine whether prison officials have violated the Eighth Amendment, we apply a two-prong test:  (1) the deprivation must be 'objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal

civilized measure of life's necessities'; and (2) the prison official must have been 'deliberate[ly] indifferen[t] to inmate health or safety.'" *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 441 (3d Cir. 2020) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Such necessities include food, clothing, shelter, medical care and reasonable safety. *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000). "To violate the Eighth Amendment, conditions of confinement must be dangerous, intolerable or shockingly substandard." *Riley v. Jeffes,* 777 F.2d 143, 147 (3d Cir. 1985); *Inmates of Allegheny Cnty. Jail v. Pierce,* 612 F.2d 754, 757 (3d Cir. 1979). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

For the most part, Williams has not alleged objectively serious conditions that rise to the level of an Eighth Amendment violation. As he describes it, with the exception of two two-week lockdown periods when there were Covid-19 outbreaks, he received daily opportunities to shower, recreate, and use the "kiosk," even though those opportunities may not have been as plentiful as those in general population. (*See* Am. Compl. ¶ 28.) Although he alleges that, during the lock down periods, he was denied access to cleaning supplies and fresh air (presumably a reference to time outside), (*id.* ¶ 48), these were relatively short periods of time. *See Walker v. Sorber*, No. CV 21-3477, 2022 WL 4586137, at *7 (E.D. Pa. Sept. 29, 2022) ("[L]imited periods of time without access to exercise or the outdoors do not give rise to an Eighth Amendment claim."). In sum, Williams' allegations reflect that his conditions did not fall below minimum constitutional thresholds and that his basic needs (food, sanitation, shelter, safety) were met despite the restrictive conditions in which he was housed. *See, e.g.*, *Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d

Cir. 2010) (concluding that denial of showers for fifteen days did not violate the Eighth Amendment when the inmate did not "suffer[ ] any harm as a result of the denial of additional showers"); *Thomas v. SCI-Graterford*, No. 11-6799, 2014 WL 550555, at *5 (E.D. Pa. Feb. 12, 2014) (concluding that denial of cleaning supplies for a two-week period was not sufficiently serious to satisfy the objective component). Nor do Williams' allegations support an inference of deliberate indifference in the context of handling the virus during the pandemic. *See generally Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) (holding that prison officials' "failure to eliminate all risk" in the context of managing covid-19 does not amount to deliberate indifference).

The one possible exception here relates to Williams' allegation that he was "denied to see the psychologist when he requested" even though he "informed staff that he was having suicidal thoughts" and was beginning to "suffer[] mental anguish." (Am. Compl. ¶¶ 46-47, 60.) These allegations, however, are undeveloped and, more importantly, are not tied to any of the named Defendants. In other words, Williams does not allege how Sorber, Wetzel, or Little are in any way responsible for denying him medical care he claims he required. Accordingly, Williams has not stated an Eighth Amendment claim against Defendants based on the conditions in which he was held in R-Unit.

### 2. Due Process Claims

#### a. Substantive Due Process

In his Amended Complaint, Williams has also failed to allege a substantive due process claim. When addressing a substantive due process challenge "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 174

(3d Cir. 2004) (quoting *Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  "Whether an incident 'shocks the conscience' is a matter of law for the courts to decide." *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)).  "The context of the Government's conduct is essential to determine whether it shows the requisite deliberate indifference that shocks the conscience for a substantive due process violation." *Hope*, 972 F.3d at 330 (internal quotations omitted).  "Just as we afford leeway to prison medical officials in diagnosing and treating a[n inmate's] physical and mental health, deference is due prison administrators [in the context of their judgments about how to handle the pandemic]." *Id.*

Williams' Amended Complaint reflects that Defendants were making difficult choices regarding how to manage the spread of the Covid-19 virus in a carceral setting during a pandemic. As another court has observed, prison officials' efforts "to vaccinate prisoners against the COVID-19 virus and separating vaccinated and unvaccinated inmates in no way represents 'conscience-shocking' conduct.  It is, in fact, an eminently reasonable course of action to protect against the spread of the virus." *Fennell v. Wetzel*, No. 22-00880, 2023 WL 1997116, at *5 (M.D. Pa. Feb. 14, 2023), *appeal dismissed,* No. 23-1364, 2023 WL 5608411 (3d Cir. June 6, 2023); *see also Spellman v. Doe*, No. 22-0069, 2023 WL 2666694, at *3 (M.D. Pa. Mar. 28, 2023) ("Defendants' purported action of attempting to vaccinate prisoners against the COVID-19 virus and separating vaccinated and unvaccinated inmates in no way represents 'conscience-shocking' conduct."). Williams acknowledges this reality, but alleges that it was nevertheless conscience shocking to house him on R-Unit when he was healthy and because some of the inmates there were vaccinated. (ECF No. 27 at 3.)  Whether he was healthy or infected, however, misses the point, *i.e.*, that vaccination status rather than the health status of inmates determined their housing during this time.  Further, that Defendants may have executed this system imperfectly by at times including

15

vaccinated inmates on the unit or that other considerations may have been in play regarding those inmates does not render Williams' treatment conscience shocking.  In sum, Williams has not stated a substantive due process claim.  *See Burton v. Wetzel*, No. 22-1625, 2023 WL 5804324, at *3 (M.D. Pa. Sept. 7, 2023) ("The choice offered to Burton [regarding whether to take the vaccine or be transferred to a housing units reserved for unvaccinated inmates] also cannot be considered conscience-shocking behavior that would give rise to a Fourteenth Amendment due process claim.").

### b.  Procedural Due Process

Williams also brings a procedural due process claim.  Convicted and sentenced prisoners have no inherent constitutional right to any particular security classification or to any particular housing assignment.  *See Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005) ("We have held that the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement.").  Rather, in the prison context, "[d]ue process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  "[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest."  *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (quoting *Sandin*, 515 U.S. at 486)); *see also Fraise v. Terhune*, 283 F.3d 506, 522-23 (3d Cir. 2002) ("Although inmates who are transferred to the STGMU [Security Threat Group Management Unit] face additional restrictions, we hold that the transfer to the STGMU does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life.").  In deciding whether

conditions are atypical and significant for purposes of establishing a liberty interest, a court must consider "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 560 (3d Cir. 2017). In determining whether a hardship is atypical or significant, the relevant comparator is the general population. *Id.* at 564.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (cleaned up); *see also Kadakia v. Rutgers*, 633 F. App'x 83, 88 (3d Cir. 2015) ("The essence of a procedural due process claim, of course, is notice and an opportunity to be heard."). "In determining what procedural protections are adequate, we are guided by the tenet that '[d]ue process is flexible and calls for such procedural protections as the particular situation demands. Accordingly, resolution of the issue whether . . . administrative procedures provided . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected.'" *Stevenson v. Carroll*, 495 F.3d 62, 70 (3d Cir. 2007) (quoting *Mathews*, 424 U.S. at 334).

Defendants argue that the Court should dismiss Williams' procedural due process claim because he had an opportunity to be heard through the prison's grievance policy. (ECF No. 25-2 at 7.) Williams responds that his grievance was not answered and, thus, the grievance policy did not provide him the process he was due. (ECF No. 27 at 3.)

Courts have disagreed over whether conditions similar to those described by Williams amount to an atypical and significant hardship sufficient to support a liberty interest. *Compare Walker*, 2022 WL 4586137, at *12 (concluding that unvaccinated inmate who was held in quarantine "stated enough facts to make his cause of action for deprivation of a state-created liberty interest plausible on its face") *with Spellman*, 2023 WL 2666694, at *6 (dismissing procedural due

process claim raised by unvaccinated inmate who was quarantined because he "does not have an independent due process liberty interest in placement in any particular prison during the term of imprisonment imposed").  Assuming, without deciding, that Williams' placement on R-Unit for eight months triggered a liberty interest, drawing all reasonable inferences in his favor he was nevertheless provided the process he was due.

Williams' segregation in R-Unit occurred against the backdrop of a global pandemic during which prison officials had to make decisions about inmate health and safety, and it was fully within their discretion to conclude that segregating unvaccinated inmates from the rest of the inmate population was a legitimate means of controlling the spread of the virus.  *See, e.g.*, *Jones v. Cnty. of Allegheny*, No. 21-1094, 2022 WL 2806779, at *7 (W.D. Pa. June 24, 2022), *report and recommendation adopted*, No. 21-1094, 2022 WL 2803111 (W.D. Pa. July 18, 2022) ("[T]he Court must defer to the broad discretion of prison authorities in their attempt to control the spread of Covid-19 within their facility."); *see also Farmer-Shaw v. Wetzel*, No. 22-00336, 2023 WL 8239116, at *3 (W.D. Pa. Nov. 28, 2023) (observing that "the DOC's policy has been described as an eminently reasonable course of action to protect against the spread of the virus undertaken at a time when COVID-19 and its variants were spreading rapidly" and that a regulation that impinges on constitutional rights is still valid if it is reasonably related to legitimate penological interests) (quotations omitted).  It is apparent from the Amended Complaint that Williams was notified of the reason for his placement on the quarantine unit, *i.e.*, his unvaccinated status, at or around the time of his transfer and that he had the opportunity to take the vaccine if he was able and willing to do so.  This type of process generally accords with the process that must be afforded when an inmate is transferred to administrative confinement. *Cf. Stevenson*, 495 F.3d at 70 (noting, in the detainee context, that "[p]rison officials must provide detainees who are transferred into

more restrictive housing for administrative purposes only an explanation of the reason for their transfer as well as an opportunity to respond"). The process afforded was sufficient to account for the interests at stake under the circumstances because the prison had an interest in preventing the spread of Covid and keeping inmates safe, and inmates were given the opportunity to either take the vaccine or, if they could not do so, accept more restrictive housing. It is unclear what additional process under the circumstances would have accomplished. In sum, the Court concludes that Williams has failed to state a procedural due process claim.

### 3. Equal Protection Claim

Turning to Williams' equal protection claim, the Equal Protection Clause of the Fourteenth Amendment provides that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To state an equal protection violation, a prisoner must allege "that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional discrimination based on his membership in a protected class." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 305 (3d Cir. 2016) (citing *Hassan v. City of New York*, 804 F.3d 277, 294, 298 (3d Cir. 2015)). Where the plaintiff does not claim membership in a protected class, he must state facts showing that: "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *Wilson v. Schillinger*, 761 F.2d 921, 929 (3d Cir. 1985) (a litigant must show "intentional or purposeful discrimination" to establish an equal protection violation). "Persons are 'similarly

situated' for purposes of an equal protection claim when 'they are alike in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (emphasis omitted).

Williams alleges that housing him on the quarantine unit for being unvaccinated even though he had no symptoms and consistently tested negative for the Covid-19 virus violated his equal protection rights. (Am. Compl. ¶¶ 82-83.) Williams is mistaken. Courts have consistently held that it was rational and appropriate for prisons to house unvaccinated inmates separately from vaccinated inmates during the pandemic and to test them regularly for Covid. *See, e.g.*, *Walker*, 2022 WL 4586137, at *8 ("Separating those inmates who are unvaccinated, and thus more susceptible to a COVID-19 infection, from those who are vaccinated, and thus less susceptible to a COVID-19 infection, is rationally related to that goal."); *see also Beatty v. Warren*, No. 22-00105, 2023 WL 149111, at *4 (W.D.N.C. Jan. 10, 2023) ("Plaintiff has failed to allege that he is being treated differently from any other similarly situated, unvaccinated inmate. Nor does he allege that any Defendant has acted with a discriminatory motive. Accordingly, the Plaintiff's equal protection claims are dismissed."); *Jackson v. Austin*, No. 22-1027, 2022 WL 17488479, at *2 (S.D. Ill. Dec. 7, 2022) ("Indeed, there is a rational basis for testing the unvaccinated as transmission may be more likely among the unvaccinated."). Even if Defendants did not perfectly execute this strategy, such that vaccinated inmates were occasionally housed on the unvaccinated unit (for which there may have been a reason not apparent from the Amended Complaint), "the Court will not second guess where authorities move those who test positive, those who refuse to be vaccinated, those who are more vulnerable to serious complications should they contract Covid-19, and those who recover from Covid-19." *Jones*, 2022 WL 2806779, at *7; *see also Children's Health Def., Inc. v. Rutgers, the State Univ. of New Jersey*, 93 F.4th 66, 87 (3d Cir. 2024) (vaccination policy satisfied rational basis review "even if the Policy is viewed (at least initially

and briefly) as underinclusive because rational-basis review, unlike strict scrutiny, tolerates an imperfect fit between means and ends.") (internal quotations omitted).  Further, "the fact that unvaccinated inmates may choose to remain unvaccinated for various reasons, including religious and medical reasons, does not invalidate the legitimate state interest in keeping as many inmates safe from the COVID-19 virus as possible."  *Rush v. Wetzel*, No. 21-316, 2023 WL 3456921, at *4 (W.D. Pa. Apr. 12, 2023), *report and recommendation adopted*, No. 21-316, 2023 WL 3456665 (W.D. Pa. May 15, 2023); *see also Farmer-Shaw*, 2023 WL 8239116, at *5 ("Inmates who chose not to be vaccinated were rationally separated from those who were, not as punishment, but for legitimate penological and health reasons.").  Nor is it relevant that prison staff members were treated differently than inmates.  *Children's Health Def., Inc*, 93 F.4th at 85 (rejecting university students' equal protection claim based on policy that required in-person vaccination for its students, but not its staff or faculty).  Accordingly, Williams has not failed to allege a plausible equal protection claim.[4]

### 4.  First Amendment Claim

Williams' First Amendment claim is based on allegation that Defendants housed him on R-Unit to retaliate against him for exercising his right to practice his religion and his right to refuse medical treatment.  (Am. Compl. ¶ 87; ECF No. 27 at 3.)  To state a plausible First Amendment

---

[4]        Courts have rejected similar claims brought under a religion-based framework as well.  *See Ford v. Northam*, No. 22-00122, 2023 WL 2767780, at *13 (W.D. Va. Mar. 31, 2023), *aff'd*, No. 23-6410, 2023 WL 6057493 (4th Cir. Sept. 18, 2023), *cert. denied*, No. 23-6671, 2024 WL 1607845 (U.S. Apr. 15, 2024) ("[E]ncouraging vaccination and limiting participation for programs for those who refuse to be vaccinated are reasonably related to the stated interest.  Accordingly, Ford has failed to allege a violation of his First Amendment religious rights."); *Nelson v. Dinca*, No. 21-1457, 2022 WL 1284538, at *2 (W.D. Wash. Apr. 29, 2022), *appeal dismissed*, No. 22-35475, 2022 WL 17663481 (9th Cir. Sept. 21, 2022) ("The jail has a legitimate interest in maintaining the health and safety of people there especially during a pandemic.  It reduces the possibility of exposing both Plaintiff and others from Covid-19.  Furthermore, it is not so restrictive that it would tend to 'coerce' individuals into being vaccinated despite their religious beliefs.").

retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). A prisoner's filing of a grievance or expressing an intent to file a grievance constitutes constitutionally protected conduct. *See Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016); *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000). "An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than *de minimis*.'" *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)) (alterations in original). "[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." *See Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) (quoting *McKee*, 436 F.3d at 170). The timing of the allegedly retaliatory behavior relative to the constitutionally protected conduct can establish a causal link between the two. *See Watson*, 834 F.3d at 422.

Williams is correct that he has a right to refuse medical treatment and the ability to exercise his religious rights while incarcerated. However, assuming his placement on R-Unit constitutes an adverse action,[5] he has failed to allege a plausible retaliation claim based on his decision to exercise those rights. To the contrary, the facts alleged by Williams support an inference that it

---

[5]       As stated, being placed in lockdown and being moved to restricted housing are examples of adverse actions. *See Palmore*, 813 F. App'x at 70. However, simply being transferred to a less desirable housing unit does not necessarily constitute an adverse action. *See Owens v. Coleman*, 629 F. App'x 163, 167 (3d Cir. 2015) (*per curiam*) (prisoner's "mere assertion that Appellees retaliated against him by placing him in a cell with a faulty shower" did not support a retaliation claim); *Verbanik v. Harlow*, 512 F. App'x 120, 122 (3d Cir. 2013) (*per curiam*) (summarily affirming dismissal of retaliation claims on the basis that prisoner failed to adequately allege an adverse action based on his housing assignment and transfer "to a less desirous cell for filing a grievance against a defendant"). Without deciding, the Court assumes for purposes of this opinion that placement on R-Unit could rise to the level of an adverse action under the circumstances of this case.

was his unvaccinated status and the institutional management consequences his decision entailed, rather than the exercise of his constitutional rights, that resulted in his placement on R-Unit.  *See Walker*, 2022 WL 4586137, at \*9 ("Mr. Walker has not shown that the defendants segregated him in R-Unit *because of* his decision not to be vaccinated (*i.e.*, the protected First Amendment conduct or expression) rather than the medical implications of his decision not to be vaccinated (*i.e.*, the risks to himself and others in SCI-Phoenix from remaining unvaccinated)."); *see also Ford*, 2023 WL 2767780, at \*14 ("As to this type of claimed 'retaliation,' then, it is more properly described as the implementation of the policies restricting unvaccinated prisoners.").  In other words, the allegations in the Amended Complaint do not plausibly support an inference of retaliatory motive, *i.e.*, that protected conduct was a substantial or motivating factor for placing Williams on R-Unit, which is fatal to Williams' First Amendment claim.

### 5.  Denial of Access to the Courts Claim

Defendants also argue that Williams has failed to state a claim that he was denied access to the courts based on his alleged inability to petition the Pennsylvania Supreme Court or move for reconsideration of the denial of his appeal.  (ECF No. 25-2 at 11-13.)  "Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts."  *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008).  "Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an 'actual injury'— that they lost a chance to pursue a 'nonfrivolous' or 'arguable' underlying claim; and (2) that they have no other 'remedy that may be awarded as recompense' for the lost claim other than in the present denial of access suit."  *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)).  "[T]he underlying cause of action, . . . is an element that must be described in the complaint."  *Christopher*, 536 U.S. at 415.  Also, since there is no "abstract, freestanding right to a law library

23

or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

Williams' claim for denial of access concerns his ability to appeal from the Pennsylvania Superior Court's affirmance on May 7, 2020, of the denial of his post-conviction petition.[6]  (*See* ECF No. 23 at 11; ECF No. 25-2 at 12; ECF No. 27 at 3-4.); *see also Commonwealth v. Williams*, 237 A.3d 437, 2020 WL 2299761, at *4 (Pa. Super. Ct. 2020) ("We therefore conclude that the PCRA court did not err in dismissing Appellant's PCRA petition without a hearing.").  The relevant docket reflects that Williams filed an untimely petition for allowance to appeal to the Pennsylvania Supreme Court on August 4, 2020, and that the case was administratively closed three days later. *Commonwealth v. Williams*, 2825 EDA 2018 (Pa. Super. Ct.).  On October 19, 2021, Williams filed a petition for leave to file his petition *nunc pro tunc*.  *Commonwealth v. Williams*, 73 EM 2021 (Pa.).  That petition was denied on January 27, 2022.

Williams contends that his attorney missed the deadline to petition the Pennsylvania Supreme Court for review, that he learned that the petition was not filed on time after writing to the court in May or June of 2021 (a year after the resolution of his appeal), and that he was prevented from accessing the law library and did not receive "adequate assistance from persons trained in the law" to prepare his petition to seek review out of time.  (ECF No. 27 at 4.)  These allegations do not support a plausible inference that Williams sustained an actual injury as a result of the conditions on R-Unit.  As Defendants correctly note, the petition for allowance of appeal was long overdue before Williams was placed on R-Unit on August 1, 2021 and, indeed, Williams was able to file his request for his petition to be heard out of time while he was housed on R-Unit.

---

[6]     This Court may take judicial notice of underlying dockets, such as the underlying docket for Williams' appeal. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

The Amended Complaint does not support a plausible inference that an inability to access a law library or a legal assistant caused Williams to lose a nonfrivolous appeal. In other words, Williams has not plausibly alleged that he was denied access to the courts.

## V.      CONCLUSION

For the foregoing reasons Defendant's motion to dismiss Williams' Amended Complaint is granted. In response to Defendants' prior motion, Williams was provided an opportunity to amend once his complaint. Since it appears that further amendment would be futile, the Court will not provide Williams with an opportunity to file a second amended complaint. *See Fennell*, 2023 WL 1997116, at *8 ("Fennell's allegations do not implicate a substantive due process violation, an Eighth Amendment failure-to-protect or failure-to-intervene claim, or a civil conspiracy. Nor do they state a First and Fourteenth Amendment access-to-courts claim. Fennell's allegations are legally, rather than factually, deficient, and thus amendment would be futile."); and *Burton*, 2023 WL 5804324, at *3 ("No factual amendment of Burton's constitutional claims would be sufficient to state a claim upon which relief may be granted because the choice offered to Burton to accept the Johnson & Johnson vaccine or be transferred to another housing block and lose certain privileges simply does not amount to a constitutional violation."). Consistent with this memorandum, an Order follows, which dismisses this case, and which shall be entered separately in accordance with Federal Rule of Civil Procedure 58.

*NITZA I. QUIÑONES ALEJANDRO, J.*